**UNITED STATES of America,**

v.

**Michael MALOUF, Defendant.**

**No. CRIM.03–CR–10298–NG.**

United States District Court,
D. Massachusetts.

June 14, 2005.

---

316

William D. Weinreb, United States Attorney's Office, Boston, MA, for Plaintiff.

Frank J. McGee, McGee & Phillips, Marshfield, MA, for Defendant.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

**TABLE OF CONTENTS**

I. *FACTS* ................................................................. 319
   A. *Procedural Background* .......................................... 319
   B. *Evidence* ....................................................... 319
II. *BURDEN OF PROOF* .................................................... 320
   A. *Sixth Amendment Rights Under Apprendi and Harris* ............... 320
   B. *Section 841(b) After Apprendi* ................................. 323
   C. *Blakely, Booker, and Shepard* .................................. 324
   D. *District Court's Role in a Time of Changing Sentencing Law* ..... 325
   E. *Section 841 after Blakely, Booker and Shepard* ................. 327
   F. *An Alternative Holding: Due Process* ........................... 328
III. *APPLYING THE BURDEN OF PROOF TO THE FACTS* ...................... 329
   A. *Mandatory Minimum or Not* ...................................... 329
   B. *The Application of the Guidelines* ............................. 331

This case is about the interpretation of an important federal drug distribution statute, 21 U.S.C. § 841, under which the defendant Michael Malouf ("Malouf") was indicted. Section 841 creates a staircase of sentences, with steep increases at each step—statutory maximums up to life imprisonment and mandatory minimums that increase from five, to ten, and to twenty years. Where the defendant is situated on this sentencing staircase depends upon the type and quantity of drugs involved, whether the defendant has a prior felony drug conviction, and whether death or bodily injury resulted from the offense.

The interpretation of the statute is complicated by recent changes in Supreme Court sentencing law, embodied by *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *Shepard v. United States*, —— U.S. ——, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). This law substantially impacts the application of each factor in the statute—in particular, prior convictions (implicating *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)), bodily injury (implicating *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)), and drug quantity—that increases the statutory maximum penalty (implicating *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)), and/or the mandatory minimums (implicating *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524

(2002)). The question is whether, as the Supreme Court's decisional law has changed, the interpretation of 21 U.S.C. § 841 should likewise change.

Specifically, the sentencing of Michael Malouf raises the following questions: (1) Do the drug quantities outlined in 21 U.S.C. § 841 comprise elements of offenses, or sentencing factors? If the former, the relevant case is *Apprendi*, a jury trial is required and the standard of proof is beyond a reasonable doubt; if the latter, it is *Harris*, drug quantity can be determined by a judge, and the standard is a fair preponderance of the evidence. (2) What is the continued efficacy of *Harris* in the light of the Court's rulings in *Blakely* and *Booker*? (3) What is a district court to do when the First Circuit's interpretation of § 841 relies on Supreme Court precedent which predates *Blakely* and *Booker*? (4) In the alternative, however the facts are characterized (as sentencing factors or elements), where facts have a significant, indeed determinative impact, does the Due Process Clause of the Fifth Amendment require the application of the beyond a reasonable doubt standard?

On September 10, 2003, Michael Malouf[1] was charged with conspiracy to distribute five kilograms or more of cocaine, as well as a quantity of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(ii).[2] In addition, the government gave notice (under 21 U.S.C. § 851(a)) that it would rely on a prior felony drug offense as the basis for a sentencing enhancement.[3] The prior conviction, together with the quantity of cocaine alleged in the indictment, exposed the defendant, if convicted, to twenty years to life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A).

On May 28, 2004, Malouf pled guilty to the indictment, but not to all of its terms. (There was no plea agreement). Malouf, with the government's approval, reserved the right to contest the amount of drugs specifically attributable to him.

The government's position was straightforward: So long as the final sentence was less than life imprisonment (the "5 kilograms or more" statutory maximum)—as it was bound to be—the Court was authorized to decide the quantity for which Malouf was responsible. Drug quantity, the government argued, is a sentencing factor, not an element of the offense. Accordingly, *Harris* authorized the Court to determine drug quantity by a fair preponderance of the evidence, even if that amount triggered a substantial mandatory minimum sentence. *See* 536 U.S. at 567, 122 S.Ct. 2406. Since, according to the government, Malouf was responsible for over 500 grams of cocaine, and had a prior felony drug conviction, he was to be sentenced to a mandatory minimum sentence of ten years.

1. Malouf was indicted along with Frederick Joseph Martineau ("Martineau"), Edward Ennis ("Ennis"), Sabarian Taba ("Taba"), Stephen Nicholson ("Nicholson"), James Sardina Jr. ("Sardina"), and John Soares ("Soares"). A superceding indictment was subsequently brought against defendants Ennis, Nicholson, Sardina and Soares. As indicated in my Memorandum and Order Re: Motions to Suppress, dated February 23, 2005, I concluded that there was probable cause to believe that Martineau was supplying Nicholson with cocaine and that Nicholson in turn was supplying Sardina and Malouf. Ennis allegedly worked with Martineau in the distribution of drugs to Nicholson. Soares was another customer of the group.

Martineau was sentenced to 120 months. Soares, allegedly the least culpable, was sentenced to 24 months. The cases against the remaining defendants are still pending.

2. The conspiracy spanned the period from April 2003, through July 2003.

3. The qualifying charge was the defendant's 1997 conviction in Norfolk Superior Court, Docket Number 101631, for Trafficking in Cocaine.

Malouf countered that he was responsible for under 500 grams of cocaine, an amount without a mandatory minimum. *See* 21 U.S.C. § 841(b)(1)(C) (where the penalty ranges from probation to thirty years); *see also infra* Part II.B. In such a case, the sentencing range specified in the Federal Sentencing Guidelines would guide the judge in sentencing an offender up to the statutory maximum. *See United States v. Jaber,* 362 F.Supp.2d 365 (D.Mass.2005) (describing the appropriate approach to analyzing the Guidelines post-*Booker*).

At sentencing hearings held over three days, I made alternative legal and factual rulings, in part to reflect the recent uncertainty in the law of sentencing: First, in order to avoid a constitutional issue, namely the question of the *Harris* holding's continued efficacy following *Blakely* and *Booker,* I construed 21 U.S.C. § 841 as creating three offenses: 1) an aggravated offense, namely distribution of five kilograms or more of cocaine, and two lesser offenses, 2) distribution of 500 grams or more (up to 5 kilograms) of cocaine, and 3) distribution of under 500 grams of cocaine. I concluded that, under *Apprendi,* the elements of each offense were to be determined by a jury and proved beyond a reasonable doubt.

I then construed the defendant's plea as an admission to all of the elements of the indicted offense except to the drug quantity attributable to him. I found that the defendant's reservation of the right to challenge quantity amounted to a request for a jury-waived trial on the question of whether his conduct constituted the lesser included offense (under 500 grams) or the higher offense (over 500 grams). If the government agreed with the jury waiver,[4] the issue would be tried to the Court,

subject to the beyond a reasonable doubt standard.

The government vigorously objected. Nevertheless, while preserving its objections to the Court's construction of 21 U.S.C. § 841 as three offenses, the government agreed to waive the jury with respect to the determination of quantity.

Alternatively, I found that, even if the drug quantities enumerated in 21 U.S.C. § 841 comprised sentencing factors to be determined by the Court under *Harris,* I would still apply the highest burden of proof to the facts at bar. If the Sixth Amendment's jury trial right was not implicated under *Apprendi,* then at the very least, the Fifth Amendment's Due Process protections should have been triggered. Even if the full formality of a jury were not required, at the very least, the "beyond a reasonable doubt" standard was required. *See* Judge Nancy Gertner, *What Has Harris Wrought,* 15 Fed. Sent. Rep. 83, *1 (2002).

I also made two alternative factual findings. First, I found that the government had not proved beyond a reasonable doubt defendant's alleged distribution of over 500 grams of cocaine. As such, I sentenced the defendant under the Federal Sentencing Guidelines (as described below). Second, should the First Circuit analyze the burden of proof issue differently, I noted that I would have found the amount of cocaine to be over 500 grams by a fair preponderance of the evidence. Under this alternative paradigm, the defendant's sentence would have been 120 months, the mandatory minimum.

Based on my review of the evidence, and my primary use of the beyond a reasonable doubt standard, I found that the government had not proven the completion of

---

**4.** Waiver of the jury required an agreement by both the government and the defendant under Rule 23(a).

three cocaine transactions, on April 25, 2003, April 27, 2003, and June 11, 2003. As a result, I concluded that the amount of cocaine distributed was under 500 grams, and applied the Sentencing Guidelines with a one-level departure on criminal history grounds. I sentenced Malouf to 60 months' imprisonment, with a number of specific conditions designed to address his severe drug abuse problem.

## I. FACTS

### A. Procedural Background

On May 28, 2004, Malouf pleaded guilty to a one count indictment charging him with conspiracy to distribute and to possess with intent to distribute, five kilograms or more of cocaine, and a quantity of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A). At the rule 11 hearing, Malouf admitted that he conspired with Nicholson and others to distribute cocaine and marijuana and that a number of these drug transactions were documented in phone calls intercepted over Nicholson's phone.[5] He also admitted that the conspiracy involved five kilograms or more of cocaine under 21 U.S.C. § 841(a)(1).

Malouf, however, did not admit the specific quantity of drugs for which he was to be held responsible, stating (through his counsel) that he would be "contesting [at the sentencing hearing] whether or not it's over or under 500 grams." The government agreed that this issue was appropriately preserved for sentencing.

### B. Evidence

The government submitted an affidavit, which effectively comprised Special Agent Michael Kozak's ("Kozak") direct examination. Based on Kozak's affidavit, which quoted extensively from wiretapped conversations, the government argued that Malouf was responsible for 31.5 ounces of cocaine and four pounds of marijuana. The 31.5 ounces of cocaine consisted of 11 ounces purchased before the wiretap period, offered through the testimony of a confidential informant, and 20.5 ounces allegedly purchased during the 60–day wiretap period. Subsequently, the government withdrew allegations concerning amounts purchased before the wiretap period in order to protect the identity of its confidential informant.

The government then focused on evidence gleaned from the overheard conversations, and to a degree, contemporaneous surveillance of the defendants. Like many defendants, Malouf and his co-conspirators spoke in a sort of code; the government (largely through the AUSA) offered its own "translations,"[6] which for the most part were not contested.

Malouf did not contest the allegation that he purchased cocaine and marijuana

---

5. One marijuana transaction on April 29, 2003, did not contribute to the mandatory minimum issue but was considered in the total Guidelines calculation.

6. Kozak's affidavit consisted of a transcript of the wiretapped phone calls from a cell phone subscribed to and used by Nicholson. (At various times during April 2003, through July 2003, the FBI conducted court-ordered electronic surveillance of the phones of Nicholson, Sardina and Martineau). The affidavit quoted the relevant code language and, in brackets, included Agent Kozak's interpretations of the statements. During a hearing on

motions to suppress filed by the other defendants, I learned that the prosecutor provided these interpretations of the phone conversations—not Agent Kozak. Agent Kozak later reviewed the prosecutor's interpretations and apparently adopted them. As I indicated in my Memorandum and Order Re: Motions to Suppress, dated February 23, 2005, "I am very troubled that the prosecutor is providing the interpretations that should be based on the agents' independent training and experience in drug investigations." Mem. at 5 n. 6. I indicated that I would accept those interpretations ultimately adopted by the investigating agents under oath, and found that—in the

during the wiretap period. Nor did he contest the specifics of most of the transactions in which a price (or a fairly transparent code for a price) clearly was mentioned, and followed by surveillance confirming that the deal was consummated. He did, however, contest some of the inferences the government sought to draw from the conversations. In three instances, I agreed with Malouf's objections, based on my understanding of the appropriate burden of proof, to which I now turn.

## II. BURDEN OF PROOF

### A. Sixth Amendment Rights Under Apprendi and Harris

As described above, this case is about the construction of the federal drug distribution statute, 21 U.S.C. § 841. It implicates the Supreme Court's methodology in interpreting criminal statutes in cases like *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), *Jones, Apprendi, Harris*, and to a degree, its more recent jurisprudence in *Blakely, Booker* and *Shepard*.

In *Apprendi*, the Court held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed *statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added). Apprendi pled guilty to two counts of unlawful possession of a firearm and one count of unlawful possession of an

antipersonnel bomb. *See id.* at 470, 120 S.Ct. 2348. Under state law, the maximum sentence was ten years on each of the first two counts, or twenty years total.[7] *See id.*

The prosecutor asked for a sentencing enhancement under a separately codified New Jersey hate crime law. *See State v. Apprendi*, 304 N.J.Super. 147, 150, 698 A.2d 1265 (1997) (citing N.J. STAT. ANN. § 2C:44–3(e), which authorizes enhanced sentences for defendants that commit crime "with a purpose to intimidate [ ] an individual or group of individuals because of race"). The enhancement increased *both* the maximum and the minimum term to which the defendant was subject for possession of a firearm, from five to ten years to ten to twenty years, and for possession of an antipersonnel bomb, from three to five years to five to ten years. *See id.; Apprendi*, 530 U.S. at 470, 120 S.Ct. 2348. The state judge found the relevant state of mind by a preponderance of the evidence and sentenced Apprendi to 12 years on the first count, and shorter concurrent sentences on the other two counts. *See Apprendi*, 530 U.S. at 471, 120 S.Ct. 2348. The Supreme Court reversed.

To the Court, it did not matter how the legislature characterized the hate crime enhancement—as a sentencing factor or an element; so long as the enhancement had the effect of increasing the statutory maximum for the offense, it had to be found by a jury.[8] Nevertheless, in the immediate

---

case of the specific transcribed conversations at issue in that proceeding—the interpretations seemed reasonable based on my review of the materials.

In the Malouf sentencing, after critically examining three conversations interpreted by the government through agent Kozak, I determined that the evidence was deficient when measured by the reasonable doubt standard.

**7.** The maximum sentence was five years on the third count, but the plea agreement provided that this sentence would run concurrently with the other two sentences. *See Apprendi*, 530 U.S. at 470, 120 S.Ct. 2348.

**8.** *Apprendi* was presaged by the Supreme Court's decision in *Jones*, interpreting the federal carjacking statute, 18 U.S.C. § 2119. *See* 526 U.S. at 229, 119 S.Ct. 1215. In *Jones*, a jury convicted the defendant under 18 U.S.C.

aftermath of *Apprendi*, its scope was not clear:[9] Would *Apprendi* apply only to factors that increase statutory maximums? Would it apply to any factors that have an impact on the sentencing outcome?[10] Would it apply only to traditional offense factors, as opposed to traditional sentencing factors, like prior convictions?

In *Harris*, it appeared the Court would limit *Apprendi* solely to factors that increase the statutory maximum. The Court also acknowledged certain important exceptions to the *Apprendi* principle. For example, where mandatory minimums, or "traditional" sentencing factors like prior convictions in *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), were at issue, a judge could make findings in lieu of a jury. *See*

§ 924(c) and 18 U.S.C. § 2119, which included a sentencing provision that spelled out the elements of the offense. *See id.* at 230, 119 S.Ct. 1215. That provision increased the maximum sentence from 15 to 25 years "if serious bodily injury ... result[ed]." *Id.* (quoting 18 U.S.C. § 2119(2) (1988 ed., Supp. V)). Neither the indictment nor the jury verdict mentioned "serious bodily injury." *See id.* at 230–31, 119 S.Ct. 1215. Nonetheless, the judge concluded that "serious bodily injury" had occurred and thereby increased the defendant's sentence to 25 years. *See id.* at 231, 119 S.Ct. 1215.

The Supreme Court reversed, finding "serious bodily injury" to be an element of the offense and not a sentencing factor. It characterized its decision as one of statutory interpretation, but noted that "grave and doubtful constitutional questions" would be raised by any other interpretation. *Id.* at 239, 119 S.Ct. 1215 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)).

9. In *United States v. Wilkes*, 130 F.Supp.2d 222, 231 (D.Mass.2001), I noted that there are "[t]hree currents" of constitutional analysis in *Apprendi*. I described them as follows:

(1) The impact analysis: This approach suggests that, if the factor at issue has a substantial impact on the sentence, it must be considered an "element" of the offense. *See id.* It is reflected in Justice Thomas' concurrence in *Apprendi*:

[I]f the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, including the fact of a prior conviction—the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime.

*Id.* (quoting *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 2368–69, 147 L.Ed.2d 435 (2000) (Thomas, J., concurring)).

(2) The statutory analysis: The linchpin under this approach is what the statute itself describes—an offense element or a sentencing factor. *See id.* at 231–32. Throughout the *Apprendi* opinion, the Court repeated the holding that, other than the fact of a prior conviction, any fact that increases the prescribed statutory maximum penalty must be submitted to a jury and proven beyond a reasonable doubt. *See id.* at 232. The limitation on the statutory analysis approach, as noted by Justice Breyer, is that legislatures may avoid *Apprendi's* jury protections by returning to an indeterminate sentencing scheme. *See id.* (citing *Apprendi*, 120 S.Ct. at 2399–2402 (Breyer, J., dissenting)).

(3) The third approach suggests that there are certain traditional sentencing factors and certain traditional substantive factors. For example, the Court noted that recidivism is a traditional sentencing factor. *See id.* (citing *Apprendi*, 120 S.Ct. at 2362–63; *Almendarez–Torres v. United States*, 523 U.S. 224, 247, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)).

In *Apprendi*, the Supreme Court did not clearly reconcile the three approaches outlined above. The hate crime statute violated the defendant's rights under all three approaches.

10. Justice Thomas in concurrence and Justices O'Connor and Breyer in dissent noted that the logical extension of the majority's position was to factors that increase the *range* of penalties to which the defendant was subject. *See* 530 U.S. at 521–22, 120 S.Ct. 2348 (Thomas, J., concurring); 530 U.S. at 533, 120 S.Ct. 2348 (O'Connor, J., dissenting); 530 U.S. at 563, 120 S.Ct. 2348 (Breyer, J., dissenting); *see also Jones*, 526 U.S. at 252–53, 119 S.Ct. 1215 (Stevens, J., concurring).

*Harris*, 536 U.S. at 553, 557, 122 S.Ct. 2406.

*Harris* involved a single statute: 18 U.S.C. § 924(c)(1)(A). *See id.* at 550, 122 S.Ct. 2406. For carrying a firearm, the mandatory minimum was five years; for brandishing it, the mandatory minimum increased to seven years. *See id.* at 550–51, 122 S.Ct. 2406. Although Harris was "only" convicted by a jury of "carrying" a firearm, the judge found him guilty of "brandishing" and sentenced him to seven years. *See id.* at 551, 122 S.Ct. 2406.

Justice Kennedy, joined by Justices Rehnquist, O'Connor, Scalia and Breyer, interpreted § 924(c)(1)(A) as establishing a single offense, with "brandishing" a firearm a sentencing factor akin to "traditional" sentencing factors like prior convictions. *See id.* at 556, 122 S.Ct. 2406. In effect, the Court suggested that, as a general matter, whenever traditional sentencing factors appear in a statute, it is reasonable to assume that Congress intended them to be treated differently from offense elements—with a lesser burden of proof, and a judge, instead of a jury, as decisionmaker. *Cf. Castillo v. United States*, 530 U.S. 120, 126, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000) (emphasizing that "[t]raditional sentencing factors often involve either characteristics of the offender, such as recidivism, or special features of the manner in which a basic crime was carried out (*e.g.,* that the defendant abused a position of trust or brandished a gun))."

In addition, four justices found that *Apprendi* applied only to facts increasing the maximum sentence, not to facts increasing the mandatory minimum sentence [11]—a holding in which Justice Breyer did not join. Justice Breyer wrote separately, noting that he could not distinguish *Apprendi* "from this case in terms of logic." *Harris*, 536 U.S. at 569, 122 S.Ct. 2406 (Breyer, J., concurring in part and concurring in the judgment). At the same time, he reiterated his position that *Apprendi* was wrongly decided.

Justice Thomas dissented, joined by Justices Stevens, Souter and Ginsburg, characterizing *Apprendi*'s holding more broadly than the decision's majority. They opined that *Apprendi* applies whenever a "fact exposes a defendant to greater punishment than what is otherwise legally prescribed," whether that fact "raises the floor or raises the ceiling." *Id.* at 579, 122 S.Ct. 2406 (Thomas, J., dissenting).

---

**11.** The Court expressly affirmed *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). *See Harris*, 536 U.S. at 557, 122 S.Ct. 2406. In *McMillan*, the Court characterized as a sentencing factor, rather than an element, the "visible possession of a firearm." 477 U.S. at 86–88, 106 S.Ct. 2411. It upheld a statute that imposed the mandatory minimum sentence of five years where the "judge finds, by a preponderance of the evidence, that the person 'visibly possessed a firearm' during the commission of the offense." *Id.* at 81, 106 S.Ct. 2411.

Justice Stevens dissented, and in a forecast of the majority in *Apprendi*, argued, "if a State provides that a specific component of a prohibited transaction shall give rise both to a special stigma and to a special punishment, that component must be treated as a 'fact necessary to constitute the crime'" and be subjected to a jury trial. *Id.* at 103, 106 S.Ct. 2411 (Stevens, J., dissenting). Congress, he maintained, cannot avoid constitutional requirements merely by declaring that certain conduct is not an element of the offense.

As one commentator described *Harris*, the Court's ruling suggested that it was limiting the jury's function to being the adjudicator of the "worst possible fate the defendant faces," namely, the statutory maximum, as opposed to lengthy mandatory minimum sentences short of that outer limit. Benjamin J. Priester, *Structuring Sentencing: Apprendi, the Offense of Conviction, and the Limited Role of Constitutional Law*, 79 Ind. L.J. 863, 876 (2004) [hereinafter Priester, *Structuring Sentencing*].

## B. *Section 841(b) After Apprendi*

Section 841(b) [12] consists of three relevant subsections, each containing a sentencing range. Beginning with the most severe, § 841(b)(1)(A) imposes a mandatory minimum sentence of ten years and a maximum sentence of life when the offense involves five kilograms or more of a substance containing cocaine. The minimum sentence is increased to twenty years "if death or serious bodily injury results" or if the defendant has a previous felony drug conviction. Section 841(b)(1)(B) imposes a mandatory minimum sentence of five years and a maximum of forty years if the offense involves 500 grams or more of a substance containing cocaine. Again, death or serious bodily injury increases the mandatory minimum sentence to twenty years, and a previous felony drug conviction increases it to ten years. Finally, § 841(b)(1)(C) is the catchall provision that imposes a maximum sentence of twenty years and no minimum sentence, without specifying particular amounts for most controlled substances. The maximum is increased to thirty years with a prior felony drug conviction and the minimum is set at twenty years and the maximum at life if death or serious bodily injury results.

Prior to *Apprendi*, all of these factors—the amount of drugs involved in the crime, the fact of bodily injury, and the fact of previous felony drug convictions—were seen as sentencing factors found by courts. *Apprendi* modified this approach, but only to a degree. Most courts, including the First Circuit, construed *Apprendi* to require that drug quantity be treated as an element, specially charged in the indictment and submitted to the jury, whenever the enhancement takes the defendant's sentence over the applicable statutory maximum.

In *United States v. Perez–Ruiz*, 353 F.3d 1 (1st Cir.2003), for example, the court held that *Apprendi* does not preclude judicial fact findings (including findings as to drug type and quantity) that increase a defendant's sentence under 21 U.S.C. § 841, so long as the sentence remains within the default statutory maximum. *See* 353 F.3d at 15. The trial court could not sentence above the default maximum unless the jury had determined the triggering drug type and quantity. *See id.*

A conspiracy charge, like the one at issue here (and in *Perez–Ruiz* ), is particularly complex. The maximum sentence to which the defendant is exposed derives from the amounts found in the conspiracy (which have to be specially pleaded or found by a jury if they are above the catchall amount). *See id.* at 18. A judge is then obliged to sentence according to the drug amounts individually attributable to the defendant, "so long as the sentence falls within the statutory maximum made applicable by the jury's conspiracy-wide drug quantity determination." *Id.* (citing *Derman v. United States*, 298 F.3d 34, 43 (1st Cir.2002)); *see also Edwards v. United States*, 523 U.S. 511, 515, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998) (since the court sentenced defendant within the statutory maximum applicable to the conspiracy, it could determine both the amount and the kind of controlled substances for which the defendant was held responsible). Yet, again, factors that increase the minimum sentence but do not increase it beyond the maximum are not subject to *Apprendi's* safeguards.[13] *See, e.g., United States v.*

---

12. For a general analysis, *see* Derrick Bingham, Note and Comment, *The Meaning of Fifth and Sixth Amendment Rights: Sentencing in Federal Drug Cases After Apprendi v. New Jersey and Harris v. United States*, 20 Ga. St. U.L.Rev. 723 (2004).

13. The Sixth Circuit, alone, applied *Apprendi* to factors that increased the minimum sentence. In *United States v. Ramirez*, 242 F.3d 348 (6th Cir.2001), the district court sentenced the defendant to a mandatory minimum of twenty years in prison after a jury convicted him of "conspiracy to distribute

*Goodine,* 326 F.3d 26, 28, 32 (1st Cir.2003), *cert. denied* 541 U.S. 902, 124 S.Ct. 1600, 158 L.Ed.2d 243 (2004) (holding that drug quantity in § 841 is a "mere sentencing factor," and "a judge's determination of drug quantity can influence the mandatory minimum sentence imposed . . . .")

Accordingly, the government maintained that the statutory maximum of life (because of the prior conviction, *see* 21 U.S.C. § 841(b)(1)(A)) was framed by Malouf's plea to the 5 kilogram indictment, and the specific sentence within that range was framed by judicial findings about the amount attributable to him. The government's position pivots on *Apprendi's* focus on statutory maximums, on *Harris'* distinction between minimum and maximum sentences, and on *Harris'* reaffirmation of the distinction between traditional sentencing factors and offense elements established in *Almendarez–Torres. See Goodine,* 326 F.3d at 28–31 (where the First Circuit also relied on *Apprendi, Harris,* and *Almendarez–Torres* ). However, these holdings have been substantially muddied, if not entirely undermined, by the Court's decisions in *Blakely, Booker,* and *Shepard.*

### C. *Blakely, Booker, and Shepard*

*Blakely* broadened *Apprendi* by requiring that all facts "which the law makes essential to the punishment" be subject to Sixth Amendment protections. *Blakely,* 124 S.Ct. at 2537 (quoting 1 J. Bishop, *Criminal Procedure* § 87 (2d ed. 1872)).

The Court effectively chose an "impact" test, focusing on the impact of such facts on punishment, rather than on the formalistic distinctions between sentencing factors and offense elements. Its concern was not simply about a fact's effect on the statutory maximum, but more generally, about its effect on punishment.

In *Booker,* the Court reaffirmed this approach by applying it to the Federal Sentencing Guidelines. *See* 125 S.Ct. at 749 (Stevens, J.). The Sixth Amendment, the Court found, prevents federal judges from making factual determinations that increase a defendant's sentence under the Guidelines on the basis of facts not reflected in the jury's verdict. *See id.* at 756. The Court rejected the government's argument that the Federal Sentencing Guidelines were "guidelines" after all—not the "diktats" that some critics described. *See* Jose Cabranes & Kate Stith, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 95 (1998) (describing the Federal Sentencing Guidelines as a set of "administrative diktats" that the Commission "promulgated and enforced ipse dixit").

An impact test necessarily casts doubt on *Harris'* distinction between mandatory minimum provisions and statutory maximums. It is difficult to envision a situation in which a fact that determines a mandatory minimum is not considered "essential" to punishment. Moreover, if Federal Sentencing Guidelines troubled the majority in *Booker,* despite the possibility

---

cocaine" and the judge found the quantity of cocaine to be more than five kilograms. *Id.* at 350. The Sixth Circuit reversed, holding that "[a]ggravating factors . . ., that increase the penalty from . . . a lesser to a greater minimum sentence, are now elements of the crime to be charged and proved." *Id.* at 351. The court characterized *Apprendi* as having two holdings:

> [F]irst, that courts must count any 'fact' that increases the 'penalty beyond the pre-

scribed statutory maximum' as an element of the offense . . . and *second,* that it 'is unconstitutional for a legislature' to treat 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed' as mere sentencing factors . . . .

*Id.* at 350 (Siler, J., concurring).

Since the drug quantity increased the *range* of penalties it had to be charged in an indictment and proven before a jury.

of downward departures, mandatory minimum provisions are likely to be of even greater concern.[14]

And to complete the trilogy, dicta in *Shepard* even calls into question the "traditional sentencing factor" approach. In *Shepard*, the Court held that a sentencing court could only rely on prior convictions as predicates for Armed Career Criminal status, if the statutorily required characteristics of these convictions were evidenced by "the charging document, the terms of the plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant or [ ]some comparable judicial record of this information." 125 S.Ct. at 1263. Justice Thomas, concurring, went further, casting doubt on *Almendarez-Torres*, which he noted was "eroded" by the Court's subsequent decisional law. *See id.* (Thomas, J., concurring in part and concurring in the judgment). Indeed, he went so far as to count the votes for reversing *Almendarez-Torres*; a majority of the Court, he maintained, now recognized that *Almendarez-Torres* was wrongly decided. *See id.* (citing *Almendarez-Torres*, 523 U.S. at 248–49, 118 S.Ct. 1219 (Scalia, J., joined by Stevens, Souter, and Ginsburg, J., dissenting); *Apprendi*, 530 U.S. at 520–21, 120 S.Ct. 2348 (Thomas J., concurring)).

## D. District Court's Role in a Time of Changing Sentencing Law

The question is this: Do I ignore *Booker*'s impact on the *Harris* holding or *Shepard*'s on *Almendarez-Torres* in sentencing this defendant? And do I apply the First Circuit's interpretation of 21 U.S.C. § 841 in *Goodine* and *Perez-Ruiz* notwithstanding their reliance on Supreme Court precedent which is crumbling?

Lower courts are facing this dilemma across the country. For the most part, they have been carving out "exceptions" to *Harris* or *Almendarez-Torres*, to avoid the issue. In *United States v. Greer*, 359 F.Supp.2d 1376 (M.D.Ga.2005), for example, the court held that declaring a defendant an Armed Career Criminal and thereby imposing a mandatory minimum 15-year sentence absent a jury finding of three previous felony convictions under 18 U.S.C. § 924(e)(1) violates the Sixth Amendment. *See id.* at 1380. The court effectively carved out a new distinction, not previously recognized, that the Sixth amendment applies to mandatory sentence enhancements that are based on the "nature of a prior conviction" while not "the fact of a prior conviction." *Id.* Other courts have sought new and different ways to interpret existing statutes, now informed by recent decisional law. In *United States v. Harris*, 397 F.3d 404 (6th Cir.2005), for instance, the Court held that the imposition of a mandatory minimum sentence based on judicial determination of firearm *type*, as provided in 18 U.S.C. § 924(c) (the statute at issue in *Harris* and *Castillo* ), would violate the Sixth Amendment. *See Harris*, 397 F.3d at 414. The Court described the case as one of "first impression." *Id.* at 412.

My dilemma is slightly different. I could avoid any collision with *Harris* by reinterpreting § 841 as the Supreme Court did in *Jones*. In *Jones*, where the statute was equally susceptible to two interpretations, one of which raised "grave and doubtful questions" of constitutional

---

**14.** Indeed, two members of the *Harris* plurality, Justices Breyer and Scalia, took positions in *Booker* at odds with their *Harris* positions. In authoring the remedy portion of the opinion in *Booker*, Justice Breyer obviously—if reluctantly—accepted the rule of *Apprendi*, which he had not agreed to in *Harris*. *See Booker*, 125 S.Ct. at 756 (Breyer, J.). Justice Scalia, who joined the *Harris* plurality without opinion, also joined the *Booker* majority's broad statement of the *Apprendi* principle. *See id.* at 746 (Stevens, J.).

law that the other did not, the court held that it should interpret the statute so as to avoid the constitutional questions. *Jones,* 526 U.S. at 239, 119 S.Ct. 1215. But reinterpreting § 841 to bring it in line with recent Supreme Court law runs afoul of the First Circuit's pre-*Booker* interpretation in *Goodine.*

There has been considerable debate about what lower courts should do in the face of Supreme Court precedent that is now doubtful. One scholarly commentator has described various data (short of binding precedent) that a lower court might invoke, along a continuum of circumstances, to predict how its superior court will decide the matter on appeal. These data fall into the following categories, from the relatively concrete to the more abstract: (a) " 'fragmented-majority dispositional rule[s],' meaning [ ] dispositional rule[s] endorsed by a majority of the Justices when such endorsement is fragmented across two or more opinions (and perhaps two or more cases) in a manner depriving the rule of precedential status[;]" (b) dicta contained in various Justices' opinions; (c) Justices' declarations of their legal positions in public fora other than written judicial opinions; and (d) other informal information concerning particular Justices' general ideological commitments or tendencies. Evan H. Caminker, *Precedent and Prediction: The Forward–Looking Aspects of Inferior Court Decisionmaking,* 73 Tex. L.Rev. 1, 17–18 (1994) [hereinafter Caminker, *Precedent and Prediction* ]; *see generally* Kent Greenawalt, *Reflections on Holding and Dictum,* 39 J. Legal Educ. 431 (1989).

Yet, in this case, I need not go so far as to advocate the legitimacy of invoking nonbinding precedent. In my judgment, the breadth of the holdings in *Booker* and *Blakely* have in fact overruled *Harris.*[15] The Court has gone from holding that the Sixth Amendment is implicated in the determination of facts that increase a statutory maximum (*Apprendi* ) to applying the Sixth Amendment to all facts "essential to the punishment" (*Booker* and *Blakely* ). It has extended the application of the Sixth Amendment from statutory maximum penalties (*Apprendi* ) to the mandatory "Guidelines" (*Booker* ).[16]

---

**15.** Indeed, what I am doing in the instant case is consistent with Caminker's precedent model:

> Sometimes the demise of an old Supreme Court precedent is foreshadowed by newer binding precedents that are inconsistent with the reasoning or result of the old case. In such circumstances, an inferior court might conclude that the newer precedents implicitly overrule the old. Because the inferior court reaches this conclusion simply by interpreting binding precedents, the court can fairly be characterized as following the precedent model.

Caminker, *Precedent and Prediction* at 20 n. 73 (citation omitted).

**16.** Indeed, I do not regard this as a case of "anticipatory overruling," which the Court decried in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). In my judgment, the holdings of *Booker* and *Blakely* apply directly here. And they reflect not simply aberrant decisions, but a consistent decisional law across a number of cases.

One commentator described a similar dilemma after *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954):

> Brown v. Board of Education, decided in 1954, rejected the separate-but-equal doctrine and held that racial segregation in public education was constitutionally impermissible. Two challenges to segregation policies on buses followed the Brown decision. At the time those cases arose, the Supreme Court had not expressly overruled *Plessy v. Ferguson* [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) ], which allowed segregated public transportation. Under the Rodriguez view, the lower courts would have been required to follow Plessy and uphold the segregated bus policies, even though Brown clearly disapproved of public racial segregation. In fact, lower courts

And, even if one does not characterize this group of holdings as overruling *Harris,* plainly the reasoning underlying them does overrule *Harris.* At worst, this is Caminker's category (a) situation, described above, in which a majority of the Justices have endorsed a particular legal rule that is deprived of precedential status simply because it is "fragmented across two or more opinions." Caminker, *Precedent and Prediction* at 17–18.

### E. Section 841 after Blakely, Booker and Shepard

Section 841, after all, is a hybrid provision—with offense-defining aspects and ostensibly sentencing regulating portions. Its structure mirrors the statute in *Jones,* which begins with a principal paragraph appearing to list a series of obvious offense elements, followed by numbered paragraphs containing apparent sentencing factors. *See Jones,* 526 U.S. at 230, 232, 119 S.Ct. 1215. However, as in *Jones,* this "superficial impression" about the nature of the provision's components is problematic because the numbered penalty subsections "not only provide for steeply higher penalties, but condition them on further facts (injury, death) that seem quite as important as the elements in the principal paragraph ...." *Id.* at 233, 119 S.Ct. 1215. Further, as the *Jones* Court explained, it

is "at best questionable whether the specification of facts sufficient to *increase a penalty range by two thirds,* let alone from 15 years to life, was meant to carry none of the due process safeguards that elements of an offense bring with them for a defendant's benefit." *Id..*

In the instant case, the "further facts" on which enhanced penalties are based—injury, scope of the operation (as defined by quantity)—are as important as the general elements in § 841(a)—manufacture, distribution, nature of the controlled substance. Moreover, injury and quantity are the kinds of factors typically related to the offense rather than to characteristics of the offender. Indeed, I have already interpreted one aspect of § 841, the portion increasing punishment whenever "bodily injury" results, under this rationale. *See United States v. Martinez,* 234 F.Supp.2d 80 (D.Mass.2002).[17]

And the punishment ranges—minimum and maximum—increase substantially with the finding of each additional aggravating factor. The result is not a mere two-year increase as in *Harris.* For Malouf, the mandatory minimum takes him from a Guidelines range that could only go as high as 71 months (without departure), to 120 months. As one scholar noted, "[a]s a matter of statutory interpretation, ... a

refused to follow *Plessy.* One lower court noted that 'a judicial decision, which is simply evidence of the law and not the law itself, may be so impaired by later decisions as no longer to furnish any reliable evidence.'
C. Steven Bradford, *Following Dead Precedent: The Supreme Court's ill-advised Rejection of Anticipatory Overruling,* 59 Fordham L.Rev. 39, 71 (1990).
Bradford added:
The question is not whether the lower court should follow the Supreme Court, but how the lower court should follow the Supreme Court. When the Supreme Court casts doubt on its own precedent, it is better for the lower court to reject the doubtful prece-

dent and follow the doctrinal developments in more recent decisions. The same policies that usually favor stare decisis favor anticipatory overruling in these situations. *Id.* at 75.

17. I distinguished *Harris,* holding that "bodily injury" is an element of the offense necessarily determined by the jury because such a finding increased both the maximum and minimum terms. I analogized it to aggravated offenses, and lesser included offenses. The aggravated crime was distribution accompanied by serious bodily injury ("aggravated distribution"); the lesser included offense was simple distribution (distribution "simpliciter").

court might conclude that inclusion of a mandatory minimum in an otherwise offense-defining statute, rather than enactment as a clearly demarcated sentencing-regulating provision, indicated legislative intent to make that mandatory minimum a statutory element of the offense." Priester, *Structuring Sentencing* at 878 n. 92 (2004).

■ The better view in my judgment is to conclude that § 841 is an offense-defining statutory provision, all elements of which must be tried before the jury. Out of an abundance of caution, then, I interpreted Malouf's plea as an admission to one element of conspiracy—that he was a participant in a conspiracy—but I reserved for a jury-waive trial the determination of another element—statutory quantity.

## F. *An Alternative Holding: Due Process*

■ While sentencing law is being reexamined in courts across the country—appropriately, in the judgment of this Court—one thing is clear: There is a new concern for procedural fairness in the finding of facts. In the instant case, a substantial mandatory minimum sentence pivots on a finding of a specific quantity. Quantity can be "a rough measure of an offender's culpability to the extent it reflects the offender's position within the drug distribution network." Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am.Crim. L.Rev. 19, 71 (2003). As Hofer and Allenbaugh noted, the legislation appears to reflect the principal that "leaders of drug distribution operations will be linked to large amounts, while underlings will be linked only to smaller amounts reflecting their position as wholesale distributer, street-level retail dealer, etc." [18] *Id.* at 71–72. The legislative history of the Anti–Drug Abuse Act of 1986, which included substantial amendments to § 841(b), describes the quantities tied to the ten-year mandatory minimum penalties as typical of "major traffickers, the manufacturers or the heads of organizations, who are responsible for creating and delivering very large quantities," while the quantities tied to five-year minimum penalties as typical of "managers of the retail traffic, the person who is filling the bags of heroin, packaging crack cocaine into vials ... and doing so in substantial street quantities." H.R.Rep. No. 99–845, at 11–12 (1986).

In the past, before the Federal Sentencing Guidelines and mandatory minimum statutes, courts looked to other evidence of the scope of drug dealing to determine sentences (e.g., the defendant's standard of living, whether he dealt in cash, etc.). In contrast, under § 841, quantity is all, despite the fact that it may well depend on variables that have nothing to do with the real scope of the offense, or defendant's role in it (e.g., how long the government happened to have surveilled the defendant, how explicit a co-defendant was about amounts, etc.).[19]

---

18. In fact, the statute does not work that way; the mechanistic emphasis on quantity sweeps street dealers into the mix, solely by virtue of what they have distributed, *see* U.S.S.C., Report to Congress: Cocaine and Federal Sentencing Policy (2002), *available at* http://www.ussc.gov/r_congress/02crack/2002crackrpt.htm, or the length of the government surveillance.

19. In *United States v. Dicenso*, Criminal No. 03–10323, I sentenced Tomas Cubilette ("Cu-bilette") on September 30, 2004, and Carlos Diaz ("Diaz") on May 4, 2005. Neither had the benefit of a motion for a downward departure based on "substantial assistance" to the government, even though both cooperated immediately upon arrest. Cubilette described his drug trafficking in general terms; Diaz was more explicit. As a result, Diaz's Guidelines numbers were higher than Cubilette's based on his own interview. The result made no sense; the testimony at trial suggested that they were at the same level. Moreover, Cubi-

If quantity figures so prominently in this important decision, it is not unreasonable to ask, as the court did of the Federal Sentencing Guidelines in *United States v. Gray*, 362 F.Supp.2d 714 (S.D.W.Va. 2005)—what level of confidence should a decisionmaker have in that fact before it sentences? The burden of proof, the *Gray* court noted, allocates the "risk of error between the litigants" and indicates the "relative importance attached to the ultimate decision." *Id.* at 720 (quoting *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). "As a tool for reducing the risk of error," the court noted, "reasonable doubt retains its usefulness in the advisory regime." *Id.* at 723. Accordingly, the court also noted that, while it would calculate the Guidelines range under the usual preponderance standard, it would then determine whether that range would have been different had it evaluated the facts by the beyond a reasonable doubt standard, as a way to determine how much weight to give the "advice" of the Guidelines.[20] *Id.*

In the instant case, I go further. If a substantial sentence hinges on a finding of a specific quantity, then, in the language of *Gray*, I (and the public) should have a high degree of confidence in this finding. In effect, this was the message of the Court in *McMillan v. Pennsylvania*, where despite upholding a mandatory minimum sentence of five years for visible possession of a firearm, *see supra* note 11, the Court suggested a different result when the statute at issue gives the "impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." *Id.* at 88, 106 S.Ct. 2411.

Moreover, to the extent that the procedural concerns of the majority in *Booker* were assuaged by construing the Guidelines as advisory, that alternative is not available under § 841. Once a given quantity is found, the statute's range is mandatory and binding.

## III. APPLYING THE BURDEN OF PROOF TO THE FACTS

### A. *Mandatory Minimum or Not*

▮ I agree with the government that Malouf was an important customer of Nicholson's. He may well have been one of Nicholson's most important customers. Indeed, the wiretaps suggest that there were times when Nicholson allowed Malouf to have a running "tab," or money owed for transactions over a period of time, paid off as Malouf received payment from his customers. However, Malouf was also an addict; Nicholson even asked during one exchange, "are you still smoking [cocaine]?," reflecting a certain skepticism that Malouf could be counted on to follow through.

The government took the position that the defendant was responsible for 581.175 grams of cocaine (not counting amounts outside of the wiretap period), 81.175 grams over the 500 gram mandatory minimum trigger. Defendant argued that he purchased less than that amount. While

lette's presentence report disclosed the purchase of an expensive car for cash, surely a factor that gives rise to the inference of drug dealing.

**20.** The commentary to § 6A1.3 of the Guidelines states, "[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." U.S.S.G. § 6A1.3, cmt. (2004). However, Justice Thomas' dissent to the remedial opinion in *Booker* called into question the assumption in the comments to the Guidelines that the preponderance standard satisfies due process concerns. *Booker*, 125 S.Ct. at 797 (Thomas, J., dissenting).

he challenged a number of the transactions, only three bear discussion—the transactions on April 25, 2003, April 27, 2003, and June 11, 2003.

As described *supra* in Part I.B., the defendants spoke over the phone in a sort of code. Sometimes the code was completely transparent; more often, particularly when the drug involved or the specific quantity was at issue, the code was unclear. Sometimes the transaction was followed up by government surveillance, which confirmed that a drug deal was consummated; sometimes it was not. I have scrutinized each and every conversation, as well as the accounts of the surveillance that followed them.

1. On April 25, 2003, Nicholson and Malouf agreed to meet and discussed a good location. At some point, Malouf asked Nicholson to meet him at "Bagnell's" in 15 minutes. Nicholson called his girlfriend and told her that he was "at Bagnell's" waiting for Malouf to show up with money. Agents surveilled the scene and saw Malouf arrive and walk over to Nicholson. Nicholson reached into his helmet (he was on a motorcycle) and "appeared to take something out." Malouf continued walking toward the motorcycle and reached into his right pocket. Each then drove away.

Nothing in the prior conversation suggested the type or quantity of drug. While the government characterized this as a one ounce cocaine transaction (28.35 grams), based on the amount and regularity with which Malouf and Nicholson dealt, I cannot agree under either a fair preponderance or a beyond a reasonable doubt standard.

2. On April 27, 2003, Malouf called Nicholson and they agreed to meet at noon. Nicholson told Malouf to bring "eight million dollars with you" (the meaning of which was unclear). Agents surveilled Malouf, but lost him for about ten minutes.

Malouf was seen by agents driving to a Dunkin' Donuts in Pembroke and parking there. At that point, Malouf exited his car, opened the trunk and "hid a brown lunch bag." The government added that the brown lunch bag probably contained the cocaine he had just picked up from Nicholson (1 ounce or 28.35 grams). Nothing in the record supports that inference.

3. On June 11, at 3:01 p.m., Malouf called Nicholson, indicating that his "friend" called, that the "friend" wanted a "block, intact, a 12–dollar item," and that Malouf promised to find out about it. The "block, intact, a 12–dollar item," referred to an ounce of cocaine, according to the government. Malouf indicated that he would get the item so long as the "friend" brought him the money. He asked Nicholson, "Should I tell him that if he comes and brings the money ... [I'll] call you?" Nicholson replied in the affirmative so long as it was "C.O.D." or cash on delivery. Some time later, Malouf called and said that the individual had put cash in his hand, and that he would call Nicholson en route. Two hours later, Malouf called, saying he was "coming up on Freetown" about "fifteen minutes away." Nicholson said, "Okay, I'll see you when you get here."

This transaction was a close call. Quantity was arguably specified, but there was no surveillance of the transaction, and therefore no indication that it had actually taken place. The government had no calls after June 11 indicating that the deal had occurred (even though the wiretap continued until June 17.) There was no confirmation that money or drugs had changed hands on that occasion.

I concluded that, if the standard were a fair preponderance of the evidence, I would clearly agree with the government and charge another 28.35 grams to Malouf.

If the standard were beyond a reasonable doubt, I would not.[21]

By June 11, the pace of Malouf's dealings with Nicholson had apparently slowed down. Nicholson was plainly dealing with other customers. While Malouf may well have been a good customer, some of Nicholson's calls reflect skepticism that Malouf would be able to follow through, to pay what he owed. The meeting locations changed; the location mentioned in the June 11 calls was an entirely new site for Nicholson and Malouf. Under the circumstances, I cannot conclude, with what I believe to be the necessary certainty, that this transaction occurred.

Without these three transactions, on April 25, April 27, and June 11, Malouf's distribution totals fell below 500 grams, and the mandatory minimum did not apply.

### B. *The Application of the Guidelines*

The Federal Sentencing Guidelines set a base offense level for the distribution of marijuana and cocaine. Indeed, they require each substance to be converted to its marijuana equivalent through the drug equivalency table. The parties agree that pursuant to U.S.S.G. § 2D1.1(a)(3) and § 2D1.1(c)(7), Malouf is accountable for at least 100 kilograms of marijuana (translating the cocaine into marijuana equivalencies and adding the marihuana amounts to it), but less than 400 kilograms. As such, the base offense level is 26. With acceptance of responsibility—with which the government concurs—Malouf is entitled to a three level reduction to an offense level of 23.

Malouf's criminal history was calculated at eight points, or level IV. Two of those points involved traffic offenses—driving under the influence and operating after a license suspension. The defendant moved for a one-level downward departure, with those two points eliminated, and I agreed. I concluded that his criminal history should have been at six points, or a level III. The resulting Guidelines range was 57–71 months.

The defendant sought a further downward departure because of the substantial, and documented, mental and physical abuse that he suffered as a child at the hands of his father. Indeed, counsel for the defendant had known the family for a considerable period of time. He had represented the defendant's father, who served time on drug charges. Moreover, the story of Malouf's troubled childhood was confirmed by the letters sent to the Court. In addition, as described above, Malouf was addicted to a variety of substances for a considerable period of time.

Nevertheless, I declined to order a further reduction in his sentence from the range calculated above.

I sentenced the defendant to the midpoint of the range, or sixty months. Sixty months was a substantial sentence. I coupled Malouf's sentence with the requirement of drug treatment both in prison and outside. Malouf's sentence was more than adequate to meet the purposes of sentencing under 18 U.S.C. § 3553(a); it enabled him to receive treatment for his addiction,

---

**21.** The government argued that the exchange between Malouf and Nicholson suggested an intent to complete the transaction, which should be sufficient under § 841. I do not agree. The methodology for calculating drug quantity is different under the Guidelines than it is under § 841. Under the Guidelines, the court could consider other transactions as "relevant conduct," even attempted transactions. *See* U.S.S.G. § 2D1.1(b)(5) (2004).

However, § 841 is clear. It is dealing with the actual distribution of a certain quantity of drugs. In any case, even if it did allow "attempts," the indictment in the case at bar did *not so specify*.

to be punished, and to be off the streets for a considerable amount of time.

**SO ORDERED.**