UNITED STATES of America,

v.

Steven D. MUEFFELMAN, Defendant.

No. CRIM.01–10387–NG.

United States District Court,
D. Massachusetts.

Nov. 14, 2005.

Kristina E. Barclay, U.S. Attorney's Office, Boston, MA, Robert M. Goldstein, Boston, MA, Joseph F. Savage, Jr., Goodwin Procter, LLP, Boston, MA, Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA, for Steven D. Mueffelman (1), Defendant.

Maureen B. Hogan, United States Attorney's Office, Boston, MA, Jeanne M. Kempthorne, Law Office of Jeanne M. Kempthorne, Salem, MA, Peter A. Mullin, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

### TABLE OF CONTENTS

I. *GUIDELINE ANALYSIS* ............................................... 372

II. LOSS .................................................................. 373
 A. *General Principles* ....................................... 373

B. *The Evidence* ...............................................373
C. *The Amount of Loss/Victim Impact* ........................377
D. *Loss, the Guidelines and 18 U.S.C. § 3553(a)* ...........377

III. *RESTITUTION AND BOOKER* ..................................379
A. *Introduction* ...........................................379
1. *The Apprendi Position* ..............................381
2. *The Indeterminate Sentence Position* ................382
3. *The Restitution-as-Civil Position* ..................383
B. *Jointly and Severally; Pro Rata* ........................385

IV. *CONCLUSION* ..............................................386

Steven D. Mueffelman ("Mueffelman") was found guilty by a jury of thirteen counts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. His co-defendant, John S. Lombardi ("Lombardi"), pled guilty to similar counts and testified against Mueffelman. Together, Mueffelman and Lombardi set up a corporation whose goal was to guarantee home ownership to persons with marginal or poor credit, promising "100 percent financing and no closing costs." These promises induced numerous clients to hand over money for various fees and expenses, but with few exceptions, they received little in return—neither the money they had spent nor the home they desired. Tragically, the clients were poor, trusting, and disadvantaged.

The critical issue in the sentencing and in the determination of restitution (under 18 U.S.C. § 3663A (c)(1)(A)(ii), the Mandatory Victim Restitution Act ("MVRA")) was the amount of loss to these victims, an issue whose determination was complicated by the changing sentencing law. Specifically, this case raised an issue of first impression in this Circuit—whether victims who were not specifically named in the indictment could receive restitution under the MVRA. That issue requires resolution of at least two others—whether restitution under the MVRA is compensatory (to the victims) or punitive (to the defendant) or both, and if punitive to any degree, whether the order is subject to the

protections of the Sixth Amendment. I have concluded that restitution is punitive, and subject to the Sixth Amendment's protections. Nevertheless, in applying that analysis to the case at bar, I have ordered restitution to victims who, while not named in the indictment, fit within the "scheme" that was alleged and proved.

The restitution issues, like the sentencing issues involved in the instant case, were crystallized following a series of cases handed down by the United States Supreme Court after the Mueffelman verdict, but before the defendant's sentencing. First, the United States Supreme Court decided *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). *Blakely* held that a Washington State statute violated the Sixth Amendment because it authorized the trial court to impose a sentence above the "standard" statutory range if the government found any one of a list of aggravating factors. The Court noted that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds [her] proper authority." 542 U.S. at 303, 124 S.Ct. 2531.

Immediately after *Blakely*, I issued a procedural order calling for briefing on the decision's impact on prosecutions before me in which the verdict/plea occurred pre-*Blakely* but sentencing occurred post-

*Blakely.*[1] Subsequently, I concluded that *Blakely* must be applied to the Federal Sentencing Guidelines and, as such, the Guidelines were unconstitutional in their entirety. I found:

> [I]t is inconceivable that the system now required by the [*Blakely*] decision is at all consistent with anything contemplated by the drafters of the Sentencing Reform Act ("SRA"), Pub.L. No. 98–473, 98 Stat. 1837 (1987), or of the Guidelines. To literally engraft a system of jury trials involving fact-finding enhancements onto the Sentencing Guideline is to create a completely different regime than that comprehensive sentencing system envisioned by the legislation's drafters or the drafters of the Guidelines. If such a system is required to give full effect to the Constitution's jury trial guarantee then the entire sentencing system has to be recast. The constitutional sentencing pieces cannot be cobbled together by judges on a case by case basis.

*United States v. Mueffelman*, 327 F.Supp.2d 79, 82 (D.Mass.2004)(hereinafter *Mueffelman I* ). At the same time, I found that the Guidelines, which had anchored sentencing analysis for over fifteen years, must be taken into account in all cases.

I addressed the specifics of this case (and that of co-defendant Lombardi) during two days of hearings.[2] Defendant Mueffelman took the position that I did not have the authority to sentence him on the basis of facts not found by the jury. Since the jury was not asked to determine the amount of money that the clients of the company had lost, the defendant's position meant that the Court would be obliged to ignore the scope of this offense in determining the sentence. The government took the position that the Court should determine the amount of loss and that that number should drive Mueffelman's sentencing range as though the Guidelines were unchanged.

I rejected both approaches (although I adopted the government's position with respect to restitution—but not the government's rationale). I was not willing to adopt the Guidelines-mandated sentence of nearly three years suggested by the government. Nor was I willing to sentence Mueffelman to probation as the defendant urged.

I took the Guidelines into account, calculating the amount of loss attributable to Mueffelman's acts as I would have pre-*Blakely*. I then used the loss calculations to determine the amount of restitution required by the MVRA, but I did not use it to determine Mueffelman's sentence. In sentencing Mueffelman, I discounted the Guideline sentencing range three levels because I found that the amount of loss did not serve as a fair proxy for Mueffelman's culpability. The sentencing range that resulted from that adjustment was more in keeping with Mueffelman's culpability and the purposes of sentencing.

Within months of the *Mueffelman* sentencing, The United States Supreme Court issued *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), in which it applied *Blakely* to the Federal Sentencing Guidelines, finding that the mandatory "Guideline" scheme violated the Sixth Amendment.

This constitutional defect required the Court to excise the portion of the Sentencing Reform Act of 1984 (hereinafter "SRA"), 28 U.S.C. § 991 et seq., 18 U.S.C.

---

**1.** See General Procedural Order in Criminal Matters Before Judge Nancy Gertner, July 8, 2004.

**2.** Lombardi was sentenced to thirty-six months' probation.

§ 3551 et seq., that made the Guidelines mandatory, namely, 18 U.S.C. § 3553(b)(1). As a result, the Court declared the Guidelines to be "advisory." Courts are to "consider" Guidelines ranges, *see* 18 U.S.C. § 3553(a)(4), but are permitted to tailor their sentences in light of other statutory concerns. *See* § 3553(a); *Booker*, 125 S.Ct. at 757–69.

After *Booker*, the defendant moved for re-sentencing; the government opposed. I declined to re-sentence. My decision in *Mueffelman I* was consistent with the United States Supreme Court's later decision in *Booker*.[3] I sentenced Mueffelman to twenty-seven months in prison and Lombardi, who cooperated, to three years of probation. I ordered restitution in the amount of $907,864.89.

## I. GUIDELINE ANALYSIS [4]

The government and Probation argued for a loss of between $800,000 and $1,500,000, which would increase the base offense level eleven levels to a level seventeen (base offense of six plus an eleven level enhancement) U.S.S.G. § 2F1.1(a), § 2F1.1(b)(1)(L); an adjustment for more than one victim, under U.S.S.G. § 2F1.1(b)(2)(B), with an additional two levels; and an adjustment for a vulnerable victim under U.S.S.G. § 3A1.1(b) for two more points. The result was a base offense level of twenty-one with a category I criminal history, yielding a Guideline range of thirty-seven to forty-six months.[5]

Defendant argued pre-*Booker* that there should be no enhancement beyond the base offense level of six, because the issues of loss (as well as the number of victims and the vulnerability of the victims) were not submitted to the jury. At a base offense level of six, with a criminal history of I, the Guideline range was zero to six months.[6] Post-*Booker*, defendant has ar-

---

**3.** As I said in *United States v. Jaber*:

... Sentencing approaches can now be tracked along a continuum. At one end lies the mandatory extreme. To the extent that judges enforce the federal sentencing guidelines without exercising any discretion, i.e., as if they are 'mandatory,' the *Blakely–Booker* line of cases suggest that judges are behaving in an unconstitutional manner. They are arrogating to themselves fact-finding decisions which appropriately belong to juries.

On the other end of the continuum is what I have come to describe as the 'free at last' regime, or a return to pre–1984 indeterminate sentencing. Put another way, this end describes an approach to sentencing in which judges feel free to disagree about the fundamental premises of sentencing, to implement their own perceptions of what policies should drive punishment. The 'free at last' mentality is characterized by comments like, 'I won't sentence according to the Guidelines because I simply don't agree that sale of marijuana deserves such severe penalties.'

Advisory guidelines should fall somewhere in-between these poles; they should consti-

tute a regime based on rules of general application—what many have described as a common law of sentencing, supplementing, not supplanting, judges. To be sure, in this regime, the existing set of rules—the Guidelines—re very important, but they cannot be outcome-determinative without running afoul of *Booker*.

362 F.Supp.2d 365, 370–71 (D.Mass.2005).

**4.** The Guidelines Sentencing Range has been calculated using the guidelines in effect at the time of the commission of the instant offense, that is, the guidelines contained in the Guideline Manual issued, November 1, 1995. The guidelines contained in this manual are more beneficial to the defendant.

**5.** Probation took the position that Mueffelman's sentence should also be enhanced for his role in the offense under U.S.S.G. § 3B1.1(c), a position with which both the defendant and the government disagree. I adopt the parties' argument.

**6.** Each count reflected a communication with an individual beginning February 28, 1997, through July 27, 1997, each in violation of 18 U.S.C. §§ 1341 and 1342.

gued that probation is the most appropriate sentence because it would maximize defendant's ability to pay restitution under 18 U.S.C. § 3553(a)(7)(describing "the need to provide restitution to any victims of the offense").

The principal issue driving *both* the sentence and the restitution amount was the "loss" to which I now turn.

## II. *LOSS*

### A. *General Principles*

The amount of loss that a given crime has engendered is surely one measure of the seriousness of the offense. Sometimes loss is an entirely appropriate proxy for culpability. At other times, it is not. All other things being equal, one who causes a greater loss as a result of his or her illegal acts is more culpable than one who causes a lesser loss. But, as Judge Lynch noted in *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y.2004), "[i]n many cases ... the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." Loss may well be a kind of accident, depending on the fortuities of law enforcement or even the market, as much as the defendant's culpability.

Judge Lynch's comments apply with particular force in the case at bar. There is no question that real people lost money—vulnerable people sometimes losing their life savings—as a result of Mueffelman's businesses, Commonwealth Capital

Funding Corporation ("CCFC") and Home Buyers Solutions Inc. ("HBSI"). There is also no question that the business Mueffelman and Lombardi formed was not a sham,[7] that they worked hard to set it up, trying to participate in a less-than-clear legislative and regulatory housing initiative just implemented during the Clinton administration. They met with potential lenders, made presentations, traveled across the country at their own expense, drafted agreements, tried to set up connections with non-profit organizations who would meet the regulatory standards, and worked very long hours. They even had some—to be sure, not many—successes. The problem was that their representations and the fees they collected as a result, far, far outstripped their ability to deliver results. And, even after it was abundantly clear that they would not be able to satisfy the expectations they created, they continued to collect money and to profoundly misrepresent the risks to the people they ostensibly served.

### B. *The Evidence*

Commonwealth Capital Funding Corporation ("CCFC"), a Massachusetts corporation, was founded by Mueffelman, Lombardi and Richard O. Wirth. Each was a one-third owner of CCFC, as well as a CCFC officer and director. In founding CCFC, the defendant, Lombardi and Wirth used an inactive Massachusetts corporation that had been formed in 1993, changing its name to CCFC.[8]

7. The defendant claims that there was a variance between the indictment and the proof on this issue—that the superceding indictment alleged a "sham" organization while the government proved a "false statements" case, i.e., that the defendants made certain false statements in connection with their business. I denied defendant's motions for judgment of acquittal, which alleged that variance. However the variance issue is resolved, for sen-

tencing purposes it is significant that acts of Mueffelman and Lombardi ranged along a continuum from good faith efforts to set up a business, through a variety of acts of ineptitude, negligence, recklessness, and finally, fraud and misstatements.

8. Thereafter, in CCFC's sales literature and its submissions to the Better Business Bureau (BBB), CCFC falsely suggested it had been in

The defendant became CCFC's President. He was involved in the recruitment of sales representatives and conducted extensive negotiations with potential lenders and non-profit corporations. Lombardi was named Vice President and Treasurer of CCFC; he was present at CCFC's offices on a regular basis throughout its operations. Wirth was the Clerk of CCFC and, at times, acted as its General Counsel. Wirth was actively involved in CCFC from September until December 1996, when he had a falling out with the defendant and Lombardi regarding money they had taken out of CCFC.

CCFC's avowed purpose was to assist individuals of marginal or poor credit to achieve home ownership, supposedly offering 100% financing and no closing costs. (After CCFC had been operating for a while, it changed its sales literature to state that it guaranteed "up to" 100% financing.) The defendant and Lombardi described CCFC to potential clients as a group of investors who purchased homes at 94% of market value and then resold the homes to clients at 100% of market value. They claimed that they were able to do so by using local, state, and federal government loan programs. They further represented that they had lenders ready to provide loans to enrolled clients.

Initially, CCFC purported to offer two programs. The first was known as the "direct purchase" program. Under this program, clients would pay an enrollment fee and CCFC would assign a real estate agent to work with them to find a suitable home within their price range. When a house was located, CCFC was to make an offer of no more than of 94% of the value of the house. If the offer was accepted, CCFC would re-sell the house to the client at 100% of market value, and arrange for 100% financing and no closing costs. CCFC represented that it had lenders available to provide such financing.

The second program, called either the "delayed purchase" or "lease-to-own" program, was designed for clients who could not qualify for immediate purchase because of problems with their credit history.[9] Under this program, clients were assigned a real estate agent who would try to locate a home within their price range. Once a home was located, CCFC was to purchase the home and lease it to the client. In the later stages of its operation, CCFC represented that a non-profit corporation, Community Homeowners Association, Inc. ("CHA"), would purchase the home and lease it to the client. Monthly lease payments were to equal the monthly principal, interest, taxes and insurance on the property, plus a 10% management fee. The lease was to include an option to purchase the house once the client had cleaned up his/her credit history and could qualify for the loan.

As the jury found, many of these representations were false. CCFC did not have financing available to fund house purchases or a non-profit corporation that would purchase houses for those unable to qualify. In fact, CCFC even had difficulty lining up mortgages for their clients, although Mueffelman unquestionably tried hard to do so. Moreover, they did not make a formal arrangement with a non-profit organization (to which U.S. Department of Housing and Urban Development ("HUD") funds would be lent) until they contracted with CHA in December of 1996 or January of 1997. Even then, CHA's

---

business since 1993 and had an unblemished record. In fact, CCFC was an untested start-up, trying to implement a new government program.

9. This group accounted for more than 90% of CCFC's clients.

ability to meet their expectations was doubtful. While CCFC explained many of the risks of the program in its promotional materials, it clearly left out critical facts.

At the same time, however, the government's own witness, co-defendant Lombardi, testified at great length that he and Mueffelman had begun the business in good faith, and that Mueffelman, in particular, had worked long hours to get financing for their clients. Mueffelman made arrangements for CCFC to share space within the offices of Constitution Financial Group ("CFG"), a bona-fide Massachusetts mortgage broker/lender company headquartered at the Schraffts Center in Charlestown, Massachusetts. CFG pulled credit reports on prospective CCFC clients and provided pre-qualification letters regarding whether the client would qualify for a mortgage and in what amount. CFG took loan applications from CCFC clients and tried to find lenders who were willing to grant the loans. After several months, however, it was clear that most CCFC clients could not qualify for any existing loan program, although some did in fact get loans through CFG.[10] In or about late March 1997, there was a falling out between CCFC and CFG. As a result, CCFC moved to new office space in Dedham, Massachusetts.

During the spring of 1997, CCFC began to focus on using CHA as the entity responsible for purchasing properties for CCFC clients under the delayed purchase program. CHA, with Dwight Miller as its President, had initially been formed to assist Dorchester residents with mortgage foreclosures. In August 1995, it had become a HUD-approved, non-profit corporation eligible to participate in HUD programs. In September 1996, HUD issued Mortgagee Letter 96–52, permitting qualified non-profits to participate in HUD's 203(b) loan guarantee program as borrowers. Under this program, the Federal Housing Administration ("FHA") would guarantee loans issued to non-profits, who would in turn lease the property to tenants. These loans were then assumable.

Also during the spring of 1997, Mueffelman worked to interest several lenders in this non-profit, lease-to-own program, including Crossland Mortgage Corp., Merrimack Mortgage Company, North American Mortgage Company, and Malone Mortgage Company. Each organization expressed some initial interest but none ultimately chose to fund loans for CCFC on a regular basis. On May 30, 1997, Crossland issued a letter to Dwight Miller, indicating that he was approved to do four loans with Crossland. On June 3, 1997, North American issued a handwritten letter to Miller stating that it was prepared to entertain his applications for loans. On June 10, 1997, Merrimack issued a letter to Richard Lahar, a CCFC employee, indicating the approval of CHA as a non-profit organization with Merrimack, provided that CHA maintained the necessary cash balances discussed in Mortgagee Letter 96–52. On June 20, 1997, Malone Mortgage Co. issued a pre-qualification letter to CHA for $160,950.00, pursuant to FHA's 203(k) program for rehabilitation loans.

Indeed, Malone appeared to be a real prospect. The defendant and Dwight Miller traveled to California at the defendant's expense on July 1, 1997, to meet with William McGuire of Malone and explain the CCFC program to him. On July 7, 1997, the defendant sent McGuire a twenty-one page package via facsimile.

**10.** CFG agreed to split with CCFC the fees CFG obtained from lenders for having originated loans relating to CCFC clients.

On July 15, 1997, Dwight Miller sent Mr. McGuire five loan packages for Malone's consideration.

But these few commitments did not come close to the representations Mueffelman and CCFC had made to over 300 clients. CCFC never closed any loans under its lease-to-own program, either in its own name or in the name of CHA. During June and July 1997, CHA obtained one loan from Crossland and two loans from Merrimack to purchase properties which were apparently unrelated to CCFC and its clients. The seventeen loans CCFC finally closed were all direct purchases where the CCFC client qualified for the mortgage on their own.

Still, Mueffelman and Lombardi pressed on and during July 1997, CCFC prepared new client agreements and sales literature in the name of CHA, which provided that the client would pay his/her fee to CHA. (This change in the literature followed consultations with Michael Hanson, an attorney and former Massachusetts State Banking Commissioner.) In late July 1997, CCFC held a meeting in a hotel in Dedham for its sales representatives, at which the defendant and Lombardi announced that CCFC was going to be the marketing arm for CHA and distributed the new CHA sales literature and agreements. Miller had been requested to appear at this meeting but he did not.

By July 1997, defendant's efforts were too little, too late. CCFC had gotten in far too deep, continuing to accept new clients despite CCFC's problems and, more importantly, continuing to accept their fees.[11] On July 28, 1997, William McGuire (of Malone Mortgage) wrote to Dwight Miller, stating that he found the CCFC program "intriguing" but that "Malone is not interested."

By August of 1997, with customer complaints mounting, and the state investigation beginning, CCFC's activities stalled. Numerous purchase and sales ("P & S") agreements had been signed, and closings scheduled, but when the closing dates came, CCFC did not have financing for its clients and required the sellers to postpone the closing dates. Clients had incurred expenses for appraisals, home inspections, insect inspections and moving expenses, in addition to their CCFC enrollment fees, and then could not close. Many clients had given notice to landlords to terminate their leases. There were numerous requests for refunds, which CCFC generally refused.

On August 12, 1997, the Massachusetts Attorney General ("AG") filed a civil injunctive action in Suffolk Superior Court against CCFC, the defendant, and Lombardi, among others, alleging unfair and deceptive trade practices in violation of Mass. Gen. Laws, ch. 93A.[12] Shortly

---

**11.** In February 1997, CCFC began getting inquiries from the Better Business Bureau ("BBB") relating to complaints it had received from CCFC clients regarding CCFC's failure to provide financing for homes they had found and its failure to refund client enrollment fees. In early April 1997, the BBB wrote to the defendant, asking for the names and addresses of ten satisfied customers. At the suggestion of Wirth, the defendant wrote back, declining to provide the requested information on the ground of concern for client confidentiality. He subsequently provided the names and addresses of ten CCFC

clients who had either closed on a home or were scheduled to close on a home.

**12.** The issue of multiple causation commonly arises when a defendant's conduct has apparently caused some actual loss to the victim, but here the defendant alleges that but for the intervention of unforeseen factors, the loss would have been smaller or would not have occurred at all. *See United States v. Rostoff*, 53 F.3d 398, 406–08 (1st Cir.1995); *United States v. Forchette*, 220 F.Supp.2d 914, 924–25 (E.D.Wis.2002). Thus, argues defendant, the AG's intervention, not their misfeasance,

thereafter, Judge Carol Ball entered a preliminary injunction prohibiting CCFC from accepting fees from new clients. The injunction did not prohibit CCFC from closing loans for its existing clients, and three of the seventeen loans for CCFC clients which actually closed, did so after August 21, 1997.

The defendant and Lombardi continued to operate in Florida. In May 1997, the defendant and Lombardi had incorporated Home Buyers Solutions, Inc. ("HBSI"), a Delaware corporation, with a principal place of business in Largo, Florida. They claimed that HBSI was the marketing arm for Affordable Housing Concepts, Inc. ("AHCI"), a Florida non-profit, which had obtained HUD certification as of June 3, 1997. On August 25, 1997, the defendant and Lombardi opened an HBSI bank account in Florida. During the period from August to October 1997, they deposited approximately $165,000.00 in additional client fees into this account.

### C. The Amount of Loss/Victim Impact

The victims in this case are the CCFC and HBSI clients who paid the enrollment fees but never received a refund even when CCFC and HBSI were unable to secure financing for the purchase of their respective homes. The government has identified more than 300 victims, though nearly half of the addresses of these victims are unknown. The victims whose addresses were ascertainable were given an opportunity to submit a victim impact statement. Many victim impact statements were filed; several individuals testified at sentencing.

In addition to injunctive relief, the Massachusetts court ordered restitution based on the losses of Massachusetts residents. To that list the government has added the names of clients outside of Massachusetts and adjusted the amount for refunds made.[13] While Mueffelman was not represented during the state court proceeding, he has not contested the $907,864.89 figure. He does contest its significance in sentencing.

Mueffelman suggests that since CCFC was not a sham organization and surely was not one *ab initio*, I should "count" only the losses engendered from the date when there was no hope of satisfying the clients' expectations.[14] The date of that change, he suggests, was July 28, 1997—when William McGuire (of Malone Mortgage) wrote to Dwight Miller, advising that he found the program "intriguing," but that "Malone is not interested." Until that point, the defendant could have reasonably believed that CCFC's program would receive funding from one of the numerous sources it was pursuing.

But as the government rightly pointed out, the jury found otherwise, concluding that Mueffelman was guilty of fraud with respect to transactions spanning the entire period of the indictment. I will not ignore that verdict. *See, e.g., United States v. Pimental*, 367 F.Supp.2d 143, 150–53 (D.Mass.2005).

### D. Loss, the Guidelines and 18 U.S.C. § 3553(a)

Nonetheless, as Judge Lynch's decision in *United States v. Emmenegger* suggests,

---

caused the losses in this case. The argument is unavailing. The AG stepped in because there were real concerns about illegal behavior on the part of defendants.

**13.** CCFC and HBSI had at least 337 clients, including 291 Massachusetts clients and 46

clients from New Hampshire, Vermont, Connecticut, Rhode Island, Texas, North Carolina and Minnesota.

**14.** To be sure, Mueffelman preserved his objection to my "counting" the losses at all.

issues concerning the blameworthiness of a defendant found guilty of fraud are more complex than simply measuring the amount of the loss. Indeed, even pre-*Booker*, loss was not an automatic measurement of culpability. For example, Guideline law permitted a judge to consider whether the amount of loss overstated defendant's culpability. *See* U.S.S.G. § 2B1.1, Appl. Note 19(C). *See, e.g., United States v. McBride*, 362 F.3d 360 (6th Cir.2004) (explaining that although intended loss drives offense level even where scheme to defraud could not have succeeded, impossibility of scheme can be a basis for departure); *United States v. Lauersen*, 348 F.3d 329 (2d Cir.2003) (holding that where multiple adjustments result in very high offense level that substantially overstates seriousness of offense, district court may depart downward); *United States v. Gregorio*, 956 F.2d 341 (1st Cir.1992) (holding that downward departure is appropriate where degree of loss was caused by downturn in economy); *United States v. Graham*, 146 F.3d 6 (1st Cir.1998) (holding that loss overstates culpability where lower loss attributed to similarly situated defendants); *United States v. Monaco*, 23 F.3d 793 (3d Cir.1994) (explaining that loss overstates seriousness where defendant had no intent to steal); *United States v. Stuart*, 22 F.3d 76 (3d Cir.1994) (affirming loss calculation based on face value of stolen bonds, but suggesting appropriateness of departure on remand where defendant received little money for participation in offense, causing loss to overstate seriousness of offense).

■ This approach—treating loss as a contingent factor, whose significance depends on the circumstances—is especially salient post-*Booker*. With advisory Guidelines, the amount of loss should be understood in the context of the purposes of sentencing enumerated in 18 U.S.C. § 3553(a), including deterrence, incapacitation, just punishment and rehabilitation, as well as the need to provide restitution to any victims of the offense. I can adequately address the latter through a separate order under the MVRA (see section III). Sentencing, and more particularly, imprisonment, raises other issues.

■ Mueffelman, as described above, both earned a considerable amount of money, and poured money back into the business—trips paid for on his own dime, substantial work, real efforts to salvage a failing operation.[15] While the jury was not persuaded that evidence of Mueffelman's good faith was sufficient to exonerate him,[16] that evidence is nevertheless relevant at sentencing. It suggests that the

---

**15.** Initially, the defendant, Lombardi and Wirth were equal owners of CCFC and drew equal salaries of $1,000 per week. After Wirth withdrew from the business, the defendant and Lombardi increased their salary to $2,000 per week. The defendant and Lombardi also took additional distributions from CCFC whenever there were funds available in CCFC's accounts. These distributions totaled over $120,000 over the 11 months CCFC operated. Total CCFC payments to the defendant were $167,132, while total payments to Lombardi were $179,602. After the Massachusetts AG filed suit against CCFC, the defendant and Lombardi began using the HBSI corporation.

**16.** "Good faith" was defined in the instructions—over the government's strenuous objections—as follows: "A defendant acts in good faith when he actually believed 1) that the plan would succeed, 2) that promises made would be kept, and 3) that representations would be fulfilled. An honest belief in the truth of the representations made by a defendant at the time they were made, however inaccurate the statement may turn out to be, is not consistent with an intent to defraud. Likewise a fraudulent intent is not necessarily to be inferred from the fact that the venture was unprofitable. Nor is fraudulent intent established by evidence that a person made a mistake of judgment or an error in management or was careless."

losses generated by Mueffelman's businesses are not the complete, much less the fair, measure of his culpability. At the very minimum, clients got Mueffelman's *work* on their behalf, even if they did not get the results he promised. Lombardi agreed that the two of them worked "sixteen hours" a day, six days a week, to make the program successful.

As was the case in *Emmenegger*, Mueffelman surely did not intend for people to lose over $900,000.00. On the contrary, he was consistently optimistic about his chances of getting financing for his clients in time to meet his obligations. As late as July of 1997, he was still tirelessly trying to make deals and close transactions.

Let me repeat: None of this excuses Mueffelman's conduct or cast doubt on the jury's verdict. His efforts did not begin to meet the demand he had generated or the representations he had made. But the bona fide work he put into these enterprises suggests that the amount of the loss is not an appropriate proxy for Mueffelman's culpability or a one-to-one measure of what his sentence ought to be. Consequently, I discounted the loss three levels from the Guideline sentencing range (level twenty-one to level eighteen), and sentenced the defendant to the low end of the applicable range. He had no record; he had been a productive and law abiding member of the community for most of his sixty plus years. A sentence of imprisonment of this length is plainly consistent with deterrence, and with just punishment under 18 U.S.C. § 3553(a).

## III. *RESTITUTION AND BOOKER*

### A. *Introduction*

■ According to the government, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A(a)(1), obliges the Court to order full restitution to all of the victims of the defendant's scheme, without regard to the defendant's economic circumstances or whether the victim is specifically named in the indictment. At the sentencing hearing on November 1, 2004, the United States introduced into evidence the affidavit of Thomas J. Zappala, an auditor employed by the United States Attorney's office. Zappala's affidavit listed the 326 victims of the defendants' offenses and calculated the restitution owed as $907,864.89.[17] The government urged the Court to incorporate Exhibits A–1, A–2 and A–3 to the Zappala Affidavit into the Judgments, as well as to include those three schedules as part of the restitution order. (These exhibits listed the names and addresses of the 326 victims. *See United States v. Stover,* 93 F.3d 1379, 1389 (8th Cir.1996)) (holding that, as a general rule, district court should identify recipient of restitution and the amount owed).

The defendant argued that the *Apprendi–Blakely–Booker* trilogy limits restitution to the victims named in the counts of conviction. Since the indictment only named individuals in connection with the thirteen counts that corresponded to the thirteen charged instances of fraudulent mailing, defendant suggests that only those victims can be the subject of the restitution order. This issue is one of first impression in this District.

■ The MVRA requires this Court to order the defendants to make restitution to the victims of their offense, except in

---

17. This included the out-of-pocket fees that clients paid, minus refunds and excluding those who did in fact receive loans.

circumstances not applicable here.[18] 18 U.S.C. § 3663A(a)(1) ("the court shall order ... the defendant to make restitution to the victim of the offense ...."). The defendant's financial circumstances provide no basis for him to avoid his restitution obligations.[19] A defendant's financial circumstances may be considered only in establishing the schedule of restitution payments. 18 U.S.C. § 3664(f)(2)(A)-(C).

The plain language of the MVRA suggests that restitution can be ordered for victims who were not the subject of the counts of conviction. The MVRA defines a victim of the offense as:

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element *a scheme* ... any person directly harmed by the defendant's criminal conduct in the course of *the scheme* ....

18 U.S.C. § 3663A(a)(2). (Italics supplied).

In the instant case, the indictment charged mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. It alleged that the defendants contrived "a scheme" to defraud individuals, notably the clients of CCFC and their other businesses, in the course of which they used the mails on thirteen specific occasions. The individuals named in the indictment were not described as the only individuals who were defrauded; the offense of conviction—the scheme to defraud—was plainly broader than that. Rather, the individual counts defined specific mailings pursuant to the larger scheme much as an overt act might define specific acts pursuant to a larger conspiracy. Indeed, Congress expressly added the word "scheme" to the words, "conspiracy, or pattern of criminal activity" in the statute.

But while that may have been Congress' intent, the question is whether Congress' intent can be fulfilled post-*Booker*, without running afoul of the Sixth Amendment. Three main arguments have been advanced against applying these constitutional protections to an award of restitution. First, some courts, adopting a rather formal approach, rejected *Apprendi* challenges on the grounds that the restitution statute, unlike sentencing provisions, had no "statutory maximum." As such, there was no benchmark that would be impermissibly increased by the findings of a judge, as in *Apprendi*. But, as I describe below, *Apprendi*'s "statutory maximum" language was considerably broadened by *Blakely* and *Booker*, which announced a constitutional violation whenever "facts essential for sentencing" are found by a judge rather than a jury. *See United States v. Malouf*, 377 F.Supp.2d 315, 324 (D.Mass.2005) (citing to *Blakely*, 124 S.Ct. at 2537). A second and related position was taken by courts that looked to the text of the restitution statute, and concluded that since it gave considerable discretion to courts, as in the pre-Guidelines indeterminate sentencing days, there were no *Booker* problems at all. However, many of these cases addressed the Victim Witness Protection Act ("VWPA"), which was

---

18. A restitution order is not required pursuant to 18 U.S.C. § 3663A(c)(3) if the Court were to find: "(A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact ... would complicate or prolong the sentencing process to [an unreasonable] degree ..."

19. The MVRA provides, in pertinent part:
 In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.
 18 U.S.C. § 3664(f)(1)(A).

supplanted in part by the MVRA. While the VWPA gave the judge considerable discretion, it is at least an open question as to whether the MVRA, which is by its own terms "mandatory", changed the Act's discretionary nature, at least with respect to the offenses to which the MVRA applied.

Third, and far more significant, numerous courts have announced that restitution is a civil and not a criminal penalty, because it is designed to compensate the victim rather than to punish the defendant. The implications of that position are the most troubling: Not only would the Sixth Amendment be inapplicable but also many of the criminal procedure provisions of the Constitution. It would effectively carve out a zone in the criminal sentencing process which was comparatively rights-free. While the law is by no means clear, this restitution-as-civil-remedy position, is belied by a) the historical treatment of restitution as a punishment tied to concepts of personal accountability, b) the legislative history of the VWPA and the MVRA suggesting that, at best, its purposes were both punitive and compensatory, c) the case law addressing the treatment of restitution as criminal in other contexts, notably bankruptcy, double jeopardy, ex post facto, and abatement. *See* Brian Kleinhaus, *Serving Two Masters: Evaluating the Criminal or Civil Nature of the VWPA and MVRA Through the Lens of the Ex Post Facto Clause, the Abatement Doctrine and the Sixth Amendment,* 73 Fordham L.Rev. 2711 (2005) (hereinafter *"Serving Two Masters"*). The First Circuit has not spoken on the issue.

I have concluded that restitution under the MVRA is best understood as a criminal penalty. But even when understood as a criminal penalty, the award is appropriate here. First, the amount of restitution flows directly from the offense of conviction, obviating any Sixth Amendment issues. Mueffelman was found guilty of participating in a very specific fraudulent scheme which involved CCFC and HBSI. The names of the clients who participated and the amount of money that they were charged by the companies was readily available in the company's files. The amount was recorded in a "client file" maintained by the companies, along with a copy of that client's check or money order.[20] The company also kept track of the refunds that had been made, an amount which was subtracted from the total. Money paid by any client who was successful in their home searches were also eliminated from the total.[21]

Second, restitution here serves both to compensate victims who are sorely in need of help as well as to make the defendants personally accountable to the people they have affected. The latter cannot be underestimated. Restitution advances the purposes of punishment—deterrence, even rehabilitation—because it makes it clear to the defendants that they must be responsible for the losses these "clients" suffered.

### 1. The *Apprendi* Position

In *United States v. Behrman,* 235 F.3d 1049, 1050–51 (7th Cir.2000), the Seventh Circuit noted that "[18 U.S.C.] § 3663A does not include a 'statutory maximum' that could be 'increased' by a given finding. Section 3663A is in this respect like a statute that permits the judge to impose

---

**20.** Clients were required to pay an "enrollment" fee of one month's gross income and to execute a client agreement and checklist in order to become a client. No "client file" was opened for a given individual until the client fee was paid in full.

**21.** In a sense, this computation was similar to the kind of computation a court uses in the case of liquidated damages. It was formulaic, flowing directly from the jury's verdict.

any term of years up to life in prison." 235 F.3d at 1054. *See United States v. Syme,* 276 F.3d 131, 158–59 (3d Cir.2002)(holding the VWPA does not specify a maximum amount of restitution, that it simply provides guidelines for the sentencing judge; accordingly, *Apprendi* does not apply because *Apprendi* only addressed criminal penalties that increased a sentence "beyond the prescribed statutory maximum"). *See also, United States v. Bearden,* 274 F.3d 1031, 1042 (6th Cir. 2001) (holding that *Apprendi* concerns are inapplicable as long as restitution does not require payment in excess of the value of the goods stolen).

*Blakely* and *Booker,* however, plainly broadened *Apprendi*'s rule. In *Apprendi,* the Court was primarily concerned with judicial factfindings that would increase a sentence beyond the statutory maximum, while in *Booker* and *Blakely* the Court's concern shifted to judicial factfindings that impact facts essential to punishment. *See U.S. v. Malouf,* 377 F.Supp.2d 315, 324 (D.Mass.2005); *Mueffelman I,* 327 F.Supp.2d at 88. ("What 'statutory maximum' means now is not just the broad punishment range in the criminal statutes. It is the 'maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant.'" *Blakely,* 542 U.S. at 303, 124 S.Ct. at 2537.) *See also,* Kleinhaus, *Serving Two Masters,* 73 Fordham L.Rev. at 2759 ("[T]he contestable issue debatably is not what the restitution statutes state is the maximum amount of restitution available for a judge to impose, but the maximum based on facts put to a jury and found beyond a reasonable doubt.")

### 2. *The Indeterminate Sentence Position*

Some courts have varied the *Apprendi* theme by suggesting that the absence of a statutory maximum in the restitution statute meant that restitution orders were never part of a mandatory sentencing scheme. As such, the concerns of *Booker* are not triggered. In *United States v. Einstman,* 325 F.Supp.2d 373, 374 (S.D.N.Y.2004), for example, the defendant argued that restitution should not be imposed because he was constitutionally entitled to have a jury find the amount of restitution beyond a reasonable doubt. *Id.* at 382. The Court rejected the argument, relying on the Seventh Circuit's opinion in *Behrman, supra,* that a judicial finding of the amount of restitution does not violate *Apprendi* but added:

> Nothing in *Blakely* would appear to alter this result; the restitutionary scheme is not part of the USSG and does not include anything like the 'relevant statutory maximum' that was decreed in *Blakely.* It appears that Congress wanted district courts to set the amount of restitution in the old-fashioned, pre-USSG way .... I see no constitutional infirmity in that ...

*Id.* The "old fashioned way" is an indeterminate regime without Sixth Amendment (or for that matter, any other constitutional criminal procedure) issues. *See Mueffelman I. See also, United States v. DeGeorge,* 380 F.3d 1203, 1221 (9th Cir.2004) (holding that restitution order pursuant to VWPA "unaffected by *Blakely*") (citing *United States v. Baker,* 25 F.3d 1452, 1456 (9th Cir.1994)); *United States v. Wooten,* 377 F.3d 1134, 1143–44 (10th Cir. 2004)(same).

It is not at all clear, particularly after the passage of the MVRA, that restitution orders mirror the old indeterminate sentencing regime. Just because there is no ceiling to the statute—no statutory maximum—does not mean that judges have discretion to order restitution in any amount they choose. Both the VWPA and

the MVRA are to be enforced in accordance with § 3664. *See* 18 U.S.C. § 3663(d), § 3663A(d). 18 U.S.C. § 3664(f)(1)(A) notes "[i]n each order of restitution, the court shall order restitution to each victim *in the full amount of each victim's losses* as determined by the court." *Id.* (Italics supplied.) Prior to the enactment of the MVRA, "as determined by the court" meant that restitution was completely discretionary; it could be ordered "in addition to ... or in lieu of any other penalty authorized by law." 18 U.S.C. § 3663(a)(1)(A). And it could be used to cover only a portion of the victim's losses if the financial situation of the defendant so required.

Under the MVRA, restitution was mandatory with respect to "identifiable ... victims [who had] suffered a ... pecuniary loss" from an "offense against property ... including any offense committed by fraud or deceit." 18 U.S.C. §§ 3663A (c)(1)(B) and (c)(1)(A)(ii). 18 U.S.C. § 3663A (b)(1) spelled out the precise contours of the order. The exceptions to the rule—unidentifiable victims, or cases involving complex issues of fact or law that would delay the sentencing process—did not materially diminish its mandatory nature in the cases that it did apply. 18 U.S.C. § 3663A (c)(3).[22]

If factfindings have determinate consequences then the specter of a Sixth Amendment violation is raised. This specter is particularly apparent in cases where the monetary loss of each victim has the kind of one-to-one correlation with the sentence, the kind of consequence with which *Booker* and *Blakely* were concerned.

### 3. The Restitution–as–Civil Position

A number of courts have concluded that restitution orders escape the strictures of *Booker* and *Blakely* because they are not designed to punish the defendant. Instead, these courts find that restitution orders are part of a separate statutory scheme, the goal of which is to compensate the victims. *See United States v. Visinaiz*, 344 F.Supp.2d 1310 (D.Utah 2004)(drawing on cases addressing whether the application of the MVRA to conduct prior to its enactment violated the Ex Post Facto Clause). As the Court in *Visinaiz* noted:

> The notion of compensating victims for losses attributable to the defendant's crime is logically and intuitively non-punitive. For example, if a burglar is caught running out of a house with the homeowner's television, we would not say he was 'punished' if the police officer took the television and gave it back to its owner. If a bank robber is caught on the bank's front steps, we would not say it is a "penalty" to give the loot bag back to the tellers. Requiring return of the property instead works to prevent a criminal from receiving a windfall by forcing him to disgorge an unjustly obtained benefit. Variations on these fact patterns are simply matters of degree. Thus, even if the burglar or the bank robber have escaped with their stolen property and have even converted it in some way, the return of equivalent value to the homeowner or the bank is better described as compensation to the victim rather than punishment of the criminal.

344 F.Supp.2d at 1320. In *United States v. Carruth*, 418 F.3d 900 (8th Cir.2005), the court characterized restitution as "designed to make victims whole, not to punish perpetrators," adding "it is essentially a civil remedy created by Congress and incorporated into criminal proceedings for

---

**22.** In fact, it was precisely because the system was not mandatory enough that the MVRA was passed. Under a purely discretionary system, judges imposed restitution in only 20.2% of all criminal cases. S.Rep. No. 104–179, at 17 (1995).

reasons of economy and practicality." 418 F.3d at 904. Likewise, in *United States v. George*, 403 F.3d 470 (7th Cir.2005) the court held that restitution is a civil remedy to which "the sixth amendment does not apply." 403 F.3d at 473.

Restitution, however, is not exclusively compensatory as either an intuitive or an historical matter. It has been inextricably tied to concepts of personal responsibility, of forcing the offender to come to grips with the impact of his or her crime on the victims. The task force whose work led to the VWPA issued a follow-up report in 1986, in which it urged society to "remember that the responsibility for crime lies with those who commit it, not with those forced to endure it." U.S. Dep't of Justice, *President's Task Force on Victims of Crime Four Years Later* iii (1986). The Senate Report on the VWPA, noted:

> The principle of restitution is an integral part of virtually every formal system of criminal justice, of every culture and every time. It holds that, whatever else the sanctioning power of society does to punish its wrongdoers, it should also insure that the wrongdoer is required to the degree possible to restore the victim to his or her prior state of well-being.

S.Rep. No. 97–532, at 30 (1982), 1982 U.S.Code Cong. & Admin.News 1982, p. 2515.

The Senate Report to the MVRA reiterated that the legislation was not intended merely to address "the loss to crime victims," but also to "ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society." S.Rep. No. 104–179, at 12 (1995). Indeed, Congress pressed for the MVRA even while acknowledging that most offenders were indigent at the time of their sentencing, and that these orders were unlikely to materially assist the victims. The Senate Report highlighted "the benefits that even nominal restitution payments have for the victim of crime, as well as the potential penalogical benefits of requiring the offender to be accountable for the harm caused to the victim." S.Rep. No. 104–179, at 18 (1995). *See generally*, Kleinhaus, *Serving Two Masters*, 73 Fordham L.Rev. at 2726–29.

No court, apart from the court in *Visinaiz*, has directly addressed the issue of whether restitution under the MVRA is a criminal punishment subject to *Booker*. At the same time, this topic has been addressed in other settings, which suggest that the MVRA is criminal in nature. For example, a number of courts have held that the Ex Post Facto Clause applied to the VWPA. *See, e.g., United States v. Jewett*, 978 F.2d 248 (6th Cir.1992)(holding that attempting to apply the expanded definition of "victim" used in the recently amended VWPA to a defendant's restitution order for a crime committed before the amendment would violate the ex post facto clause); *United States v. Gilberg*, 75 F.3d 15, 21 (1st Cir.1996)(referring to the *Jewett* holding), and more recently, to the MVRA. *See United States v. Thompson*, 113 F.3d 13, 14 n. 1 (2d Cir.1997)(applying this analysis to the MVRA). *See also* Kleinhaus, *Serving Two Masters*, 73 Fordham L.Rev. 2739–45.

The criminal/civil question is less clear when examined through the prism of the existing case law addressing abatement, double jeopardy, and Seventh Amendment concerns. In the Seventh Amendment context, courts have found restitution to fall on the criminal side of the ledger, but in the abatement and double jeopardy contexts, courts have typically found just the opposite. *See, e.g.,* Kleinhaus, *Serving Two Masters*, 73 Fordham L.Rev. at 2745–50; *United States v. Fountain*, 768 F.2d 790, 801 (7th Cir.1985) (explaining that "criminal restitution is not some newfan-

gled effort to get around the Seventh Amendment but a traditional criminal remedy"); *United States v. Christopher*, 273 F.3d 294, 299 (3d Cir.2001) (holding that restitution orders under the MVRA and VWPA do not abate along with criminal sentences when an inmate dies during his criminal appeal); *United States v. Barnette*, 10 F.3d 1553, 1558–60 (11th Cir. 1994) (holding that restitution does not violate the double jeopardy clause). This jurisprudential equivocation is, perhaps, best highlighted by the Seventh Circuit's restitution decisions, in which the court first adopted the restitution *qua* criminal punishment position in the abatement context, then later adopted the restitution *qua* civil proceeding position in the ex post facto context. *See United States v. Fountain*, 768 F.2d 790 (7th Cir.1985); *United States v. Bach*, 172 F.3d 520 (7th Cir.1999).

The First Circuit has not addressed the issue directly. In *United States v. Rostoff*, 164 F.3d 63, 71 (1st Cir.1999), the First Circuit rejected a defendant's claim that he had a Seventh Amendment right to a jury trial in a civil action to enforce a restitution order, stating "[t]he nature of restitution is penal and not compensatory." In *United States v. Hensley*, 91 F.3d 274, 276 (1st Cir.1996) the First Circuit said that the VWPA "authorizes restitutionary sentences ... for the benefit of victims of federal offenses." In *United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir.1997), the Court said that the legislative history of the VWPA "clearly signals a congressional preference for rough remedial justice, emphasizing victims' rights." The Court characterized the VWPA's authorization to enter restitution orders as "remedial provisions," in holding that they applied to the FDIC, as successor to a failed bank. *Id.* at 591.

I profess to considerable discomfort with the idea that a $907,864.89 restitution award is *not* punishment, and that the MVRA is not akin to the mandatory guidelines approach. In my judgment, the better approach, based on the language of the MVRA, and its legislative history, is to treat restitution as a criminal punishment fully subject to *Booker*'s constraints. Nevertheless, I conclude that restitution is appropriate in the amount the government proposed.

The government's proposed restitution order is appropriate because it is directly related to the "scheme" of which the jury found the defendants guilty. *See United States v. Ross*, 279 F.3d 600, 602 (8th Cir.2002)(holding that restitution in the amount of $2.7 million was related to the "advance fee" scheme alleged in the indictment and that it stemmed directly from the wire transactions submitted to the jury). Holding the defendants directly accountable to their victims is also appropriate for both the victims of this offense and for the punishment of the defendants. The defendants must be made to understand the harm they have caused. And, as men with substantial work backgrounds and at least some resources, they must be held accountable in the sense that they are required to give back what they have taken.

### B. *Jointly and Severally; Pro Rata*

 Title 18, United States Code, Section 3664(h) provides:

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

Victims, however, might not recover the full amount of their losses from each de-

fendant. *United States v. Scott,* 270 F.3d 30, 52–53 (1st Cir.2001); *United States v. Trigg,* 119 F.3d 493, 500–01 (7th Cir.1997). Thus, when the Court orders full restitution from both defendants the implication is that the defendants are jointly and severally liable for the full restitution amount. *Id.; United States v. Wall,* 349 F.3d 18, 26 (1st Cir.2003). Title 18, United States Code, § 3664(i) provides, in part:

> If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim.

Here, since there is no way to distinguish among the 326 victims, I will order that all restitution monies received by the Court be paid to the victims on a pro rata basis. *See United States v. Perry,* 360 F.3d 519, 535 (6th Cir.2004)(explaining that 18 U.S.C. §§ 3664(f)(3) and (i) appear to give trial courts the right to require pro rata distribution of restitution monies.)

 Moreover, based on the government's concerns that many of the 326 victims in this case cannot now be located, the order provides that if a victim cannot be located, the victim's pro rata share shall be distributed among those victims who can be located, until those victims have received their restitution in full.[23] Many of the addresses in the Zappala Affidavit were gathered in 1997 and 1998 by the Massachusetts Attorney General's Office. Many have moved since that time and cannot be located. The Finance Section of the Clerk's Office has advised that, absent express direction in the restitution order

to the contrary, if a victim cannot be located then that victim's pro rata share of restitution monies will be placed in an unclaimed funds account and eventually paid to the United States Treasury To avoid that result, the order has been drafted to permit pro rata distribution of unclaimed funds to the identified victims.

## IV. CONCLUSION

Accordingly, I sentenced Mueffelman to a sentence of twenty-seven months of imprisonment, twenty-four months of supervised release, and restitution in the amount of Nine Hundred and Seven Thousand, Eight Hundred Sixty–Four and 89/100 ($907,864.89) Dollars, and Lombardi to three years of probation with the same restitution.

---

**23.** If a victim cannot be located within one year of the Court's entry of the restitution order then the pro rata share attributable to such victim shall be redistributed among those victims who can be located on a pro rata basis, until such victims have received their full restitution.